UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JANE DOE, | : | |
| | : | |
| Plaintiff, | : | Case No. 2:04-cv-00914 |
| | : | |
| v. | : | JUDGE ALGENON L. MARBLEY |
| | : | |
| MICHAEL F. HOGAN, *et al.* | : | Magistrate Judge King |
| | : | |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter comes before the Court pursuant to Plaintiff's Application for Reasonable Attorneys' Fees and Expenses of Experts Retained for Litigation ("Application") pursuant to Federal Rule of Civil Procedure 54(d). For the following reasons, the Court **GRANTS** Plaintiff's Application.

### II. STATEMENT OF FACTS[1]

Plaintiff, Ms. Doe, is a thirty-four year old, deaf woman who was diagnosed as schizophrenic, and, beginning in 2004, was a patient at the Northcoast Behavioral Healthcare Psychiatric Hospital, Northfield Campus, run by the Ohio Department of Mental Health ("ODMH"). On September 2, 2004, concerned about Ms. Doe's care and treatment, as well as the services being provided to her, Ohio Legal Rights Service ("OLRS"), faxed a letter to Dr. Michael Hogan, the

---

[1] Because Plaintiff did not include a detailed statement of facts in its filings, the Statement of Facts is drawn, in relevant part, from Defendants' Memorandum Contra to Plaintiff's Application.

-1-

ODMH Director.  Ex. 1.  Shortly thereafter, on September 13, 2004, OLRS and ODMH officials met, and the parties agreed to work together to find a solution to Ms. Doe's problems.  Among the suggestions discussed was moving Ms. Doe to another facility.

On September 17, 2004, Mr. Baumgarten, Chief of the Office of Legal Services for ODMH, sent a letter to counsel at OLRS indicating that they would conduct a comprehensive review of Ms. Doe's treatment plan and acknowledging that: "It is apparent that an institutional setting such as a psychiatric hospital is not the most appropriate, least restrictive setting for (Ms. Doe) beyond a necessary period of stabilization.  Finding or developing an appropriate, well structured community setting (home) for (Ms. Doe) should be the primary goal in this case."  *See* Baumgarten Aff., ¶¶ 2-4; Ex. 2.

While the parties worked together to find a solution for Ms. Doe, on September 24, 2004, OLRS filed a Complaint on Ms. Doe's behalf in this Court.  In the initial complaint (the "Complaint"), Plaintiff sued Defendants under 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act ("ADA")[2] claiming that  Defendants, under color of state law, denied her substantive due process rights to reasonable care, treatment and safety, and denied her adequate training that would allow her to move to a less restrictive setting in the community.  Plaintiff also claimed that Defendants violated her rights under both the Fifth Amendment and the Rehabilitation Act, including failure of effective communication and provision of auxiliary aids and services.  *See* Defs.' Motion at 2.

---

[2]Each of the three statutes – (1) 42 U.S.C. § 1983; (2) Section 504 of the Rehabilitation Act of 1973; and (3) Title II of the ADA – explicitly provides for the award of reasonable attorney's fees for the prevailing party.

Notwithstanding the filing of the lawsuit, ODMH continued to work with OLRS to find an amicable solution to Ms. Doe's concerns. On December 16, 2004, representatives of OLRS met with ten key ODMH employees and their trial attorney to discuss ways to resolve this matter without protracted and costly litigation. Aff. Mr. Wise, ¶¶ 3-4. As a result, the next day, counsel for ODMH informed OLRS by letter that ODMH agreed to use its "best efforts" to find a mutually agreeable facility for Ms. Doe's treatment as soon as possible. *Id*. ¶ 5; Ex. 3.

After the meetings and discussions, on January 3, 2005, the parties filed an agreement settling the claims set forth in Plaintiff's motion for preliminary injunction. The parties agreed to use their best efforts to transfer Ms. Doe to a mutually agreeable treatment facility and acknowledged that there was no need for judicial intervention on Plaintiff's motion for preliminary injunction. Accordingly, on January 11, 2005, the parties vacated the preliminary injunction hearing date indicating that it was moot based upon the parties' voluntary actions.

On January 12, 2005, ODMH counsel informed OLRS counsel that ODMH was working diligently with the County Board to find a replacement facility for Ms. Doe. Aff. Mr. Wise, ¶ 8; Ex. 4. Later, on January 19, 2004, the parties filed their Rule 26(f) Report, in which they indicated that they had mutually agreed on how the case can be resolved. The parties further stated that they are working together to find a mutually agreeable placement suitable for Ms. Doe's needs. On March 11, 2002, ODMH wrote to the National Deaf Academy (the "Academy") in Mount Dora, Florida, and reserved a place for Ms. Doe. Aff. Mr. Wise, ¶ 9.

Without the assistance of the Court, OLRS and ODMH continued their voluntary discussions to draw up a settlement agreement. Even before such agreement was finalized, however, staff from

ODMH made the necessary arrangements to facilitate Ms. Doe's transfer to the Academy, and Ms. Doe arrived there on April 20, 2005. Aff. Mr. Wise ¶¶ 8-11; Ex.'s 4-6.

On May 9, 2005, nearly three weeks after Ms. Doe had been admitted to the National Deaf Academy,, the parties executed the Settlement Agreement (the "Agreement"). On May 10, 2005, the parties filed a joint motion for an Order of Voluntary Dismissal requesting that the Court issue an order incorporating by reference the terms of the Agreement and asking the Court to retain jurisdiction to enforce those terms. The parties asked the Court to retain continuing jurisdiction "for purposes of enforcement of the Agreement." *See* Agreement ¶ 5.B. Further, the parties noted that they did not want the agreement to operate as a "Waiver" of Jane Doe's right to seek attorney fees and costs from Defendants." *See id*. ¶ 6.[3] On June 1, 2005, the Court issued such an order.

Shortly thereafter, on June 13, 2005, Plaintiff filed an application for reasonable attorney's fees under 42 U.S.C. § 1988, 29 U.S.C. § 794(a) and 42 U.S.C. § 12133 – all statutes that provide that "the Court, in its discretion, may allow the prevailing party, . . . reasonable attorney's fee as part of the costs." Using the traditional "lodestar amount," defining the "reasonable amount" as the market rate of attorneys of comparable skill in Columbus, and supporting its calculations with affidavits, OLRS

---

[3]The language of the Agreement reads as follows:

6.  <u>Attorney's Fees</u>. This Agreement shall not operate as a waiver of Jane Doe's right to seek attorney fees and costs from Defendants; this Agreement shall not constitute an admission by Defendants that any fees or costs are owed to Jane Doe; Defendants acknowledge Jane Doe's intention to file an application with the Court for attorney's fees and costs' Plaintiff acknowledges Defendants['] intent to contest any application for attorney fees.

Agreement ¶ 6.

-4-

calculated that it was entitled to $92,557.27. Defendants responded to Plaintiff's claim on August 5, 2005, and the issue is now ripe for review.

### III. ANALYSIS

#### A. Whether Plaintiff is a "Prevailing Party"

#### 1. Background - Fee-Shifting Statutes

In the United States, parties are ordinarily required to bear their own attorney's fees; the prevailing party is not entitled to collect from the loser. *See Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975). Under this "American Rule," the judiciary follows a "general practice of not awarding fees to a prevailing party absent explicit statutory authority." *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994). Congress, however, has authorized the award of attorney's fees to the "prevailing party" in numerous statutes, such as the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k), the Voting Rights Act Amendments of 1975, 42 U.S.C. § 1973(e), and the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988.[4] *See generally, Marek v. Chesny*, 473 U.S. 1, 43-51 (1984). In designating those parties eligible for an award of litigation costs, Congress employed the term "prevailing party," a legal term of art requiring that "a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail." *See Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dept. Of Health & Human Resources*, 532 U.S. 590, 603 (2001) (citing *Hewitt v. Helms*, 482 U.S. 755, 760 (1987)). Generally, the Supreme Court has given a

---

[4]Some statutes, use the singular "attorney's fees"; some, such as the IDEA, use the plural "attorneys' fees." The Court uses one or the other depending on the statutes to which reference is being made. *See NAACP v. Town of East Haven*, 259 F.3d 113, 144 n.1 (2d Cir. 2001) (explaining the use of the singular form because of the word of the fee-shifting provisions of Title VII involved in that appeal).

generous formulation to the term prevailing party, stating that plaintiffs may be entitled to attorney's fees "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *See Hensley v. Eckerhard*, 461 U.S. 424, 433 (1983) (internal quotation marks omitted). Nevertheless, the Court recently took a somewhat more restrictive approach in its 2001 *Buckhannon* decision. 532 U.S. at 598.

### 2. The *Buckhannon* Decision

In October 1997, the plaintiffs in *Buckhannon* brought suit against the State of West Virginia and twenty other defendants seeking declaratory and injunctive relief. *See* 532 U.S. at 598-99. The lawsuit claimed that a provision of the West Virginia code requiring all residents of residential board and care homes to be capable of "self-preservation" violated federal law. *Id*. at 601-02.[5] After the parties began discovery, the West Virginia Legislature eliminated the self-preservation provision and the district court dismissed the case as moot. *Id*. at 601. Thereafter, plaintiffs sought attorney's fees as a prevailing party on the ground that their lawsuit was the "catalyst" that forced the defendants to change the law. *Id*. at 601-02. Although most circuit courts at the time recognized this "catalyst theory" as one method a plaintiff could become a prevailing party, the district court rejected plaintiffs' argument, and the Fourth Circuit affirmed that decision. *Id*.

In *Buckhannon*, the Supreme Court considered whether a plaintiff could be a prevailing party under what was termed the "catalyst theory." *See id*. As described by the Court, the catalyst theory posits that "a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought

---

[5]More specifically, West Virginia law required that all residents of residential board and care homes be capable of moving themselves from "situations involving imminent danger, such as fire." *See* W. VA. CODE §§ 16-5H-2 (1998) (repealed 2003).

-6-

about a voluntary change in the defendant's conduct." *Id*. at 601. Prior to *Buckhannon*, most Courts of Appeals to have considered the issue held that the catalyst theory was an appropriate basis for an award of attorney's fees; the Supreme Court, however, disagreed.

Relying on the definition in Black's Law Dictionary, the Supreme Court held that "a 'prevailing party' is one who has been awarded some relief by the court. *Id*. at 603. It rejected the catalyst theory as a basis for an award of attorney's fees, finding that such a theory "allows an award where there is no judicially sanctioned change in the legal relationship of the parties" and "lacks the necessary judicial imprimatur." *Id*. at 605. Essentially, in order to be considered a "prevailing party" after *Buckhannon*, a plaintiff must not only achieve some "material alteration of the legal relationship of the parties," but that change must also be judicially sanctioned. *See N.Y. State Fed.'n of Taxi Drivers, Inc. v. Westchester Cty. Taxi & Limousine Comm'n*, 272 F.3d 154, 157 (2d Cir. 2001).

The *Buckhannon* Court gave two examples of the types of relief carrying sufficient judicial imprimatur to form the basis for awarding attorney's fees to a plaintiff: (1) judgments on the merits; and (2) settlement agreements that are enforced through court-ordered consent decrees. 532 U.S. at 604. The Court noted that a consent decree is sufficient even without an admission of liability by the defendant because it constitutes a "court-ordered change in the legal relationship between the plaintiff and the defendant." *Id*. The Court also stated in a footnote: "Private settlements do not entail the judicial approval and oversight involved in consent decrees. And federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal." *Id*. n.7 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994)).

### 3. The Impact of *Buckhannon* - Whether a Private Settlement Agreement Can Convey Prevailing Party Status Upon a Plaintiff

Though *Buckhannon* clarified the existing rule by requiring that a "change in the legal relationship" must have "sufficient judicial imprimatur" to qualify a party as prevailing in a suit, the Court's endorsement of the concept of imprimatur left open the question as to exactly how much judicial approval and oversight are necessary before a settlement agreement can serve as a proper basis for prevailing party status. As a result, since *Buckhannon*, the circuit courts which considered the issue are split on whether, on the continuum between consent decrees and purely private settlements,[6] there is a line representing the point at which a party obtains a "judicially sanctioned change in the legal relationship of the parties" and "[c]rosses the statutory threshold of prevailing party status." *See Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989).

The majority of circuit courts to have considered the question, however, have answered it in the affirmative. *See Roberson v. Giuliani*, 346 F.2d 75 (2d Cir. 2003) (finding that the parties' settlement agreement conveyed prevailing party status upon plaintiff because "until the district court signed the dismissal Order retaining jurisdiction, the Agreement was not yet in affect" and, therefore, "it was the court's order that created the change in the legal relationship between plaintiffs and . . . defendants"); *Truesdell v. Philadelphia Housing Authority*, 290 F.3d 159 (3d Cir. 2002) (finding that if a private

---

[6] Purely private settlements are distinct form consent decrees in the level of both judicial approval and judicial oversight. Private settlements "ordinarily do not receive the approval of the court. . . Private settlements are also distinguished from consent decrees in terms of enforcement. . . any breach of the terms of a purely private settlement agreement gives rise to a claim for breach of contract, but not for contempt of court, as is available under a consent decree." *See* Matthew B. Tenney, "When Does a Party Prevail?: A Proposed "Third-Circuit-Plus" Test for Judicial Imprimatur," 2005 B.Y.U. LAW REV., 429, 437 (2005).

settlement is enforceable against opposing party through a court order, even though the order is titled "Consent Decree," the party in whose favor that order is entered may be termed the prevailing party); *Smyth v. Rivero,* 282 F.3d 268 (4th Cir. 2002) ("[A]n order containing an agreement reached by the parties may be functionally a consent decree for purposes of the inquiry to which *Buckhannon* directs us, even if not entitled as such."); *Barrios v. California Interscholastic Fed.*, 277 F.3d 1128 (9th Cir. 2002) (interpreting footnote 7 in *Buckhannon* as "dictum [which merely] suggests that a plaintiff 'prevails' only when he or she receives a favorable judgment on the merits or enters into a court-supervised consent decree" and finding plaintiff to be a prevailing party because he obtained a legally enforceable settlement agreement); *Am. Disability Assoc., Inc. v. Chmielarz*, 289 F.3d 1315 (11th Cir. 2002) ("if the district court either incorporates the terms of a settlement into its final order of dismissal *or* expressly retains jurisdiction to enforce a settlement, it may thereafter enforce the terms of the parties' agreement," and its authority to do so "clearly establishes a 'judicially sanctioned change in the legal relationship of the parties,' as required by *Buckhannon*, because the plaintiff thereafter may return to court to have the settlement enforced"); *but see, Christina A. v. Bloomberg*; 315 F.3d 990 (8th Cir. 2003) (continuing enforcement jurisdiction is insufficient to convey prevailing party status on the plaintiff).

In this case, Plaintiff argues that the Court should consider Ms. Doe a "prevailing party" under *Buckhannon* because, "in addition to reaching a favorable resolution to her claims, the plaintiff secured continuing enforcement jurisdiction through a settlement agreement approved by this Court incorporated in the terms of the order of dismissal entered June 1, 2005." *See* Pl.'s Application at 3. Defendants, on the other hand, counter that because the parties' Agreement did not amount to a court-

ordered consent decree, and because the Agreement did not create a material alteration of the relationship of the parties, there was "no judicial imprimatur on the decision to transfer Ms. Doe to Florida." *See* Def.'s Memo Contra at 7.[7]

Defendants argue that the Order did not create a material alteration of the legal relationship of the parties because Ms. Doe moved to the Academy in Florida on April 20, 2005, nearly three weeks before the parties signed and finalized the Agreement, and more than a month before the Order was filed. *See* Def.'s Memo Contra at 7. In other words, Defendants contend that though the terms of the Agreement stipulate that ODMH should move Ms. Doe from her current placement to the Academy, because Ms. Doe had been placed in that facility prior to the signing of the Agreement and the issuance of the Court's dismissal order, the Agreement did not materially alter Ms. Doe's rights. Plaintiff, on the other hand, relying on *Roberson*, contends that the fact that the Court maintained jurisdiction to continue to enforce Ms. Doe's rights outweighs the fact that the parties formalized the Agreement after Ms. Doe had already moved.

In *Roberson*, the plaintiffs filed a § 1983 class action against a number of defendants, challenging their policies regarding the disposition of applications for food stamps, Medicaid and public assistance benefits based on recommendations of the Eligibility Verification Review ("EVR") Offices of the New York City Human Resources Administration ("HRA"). *See id.* at 77. After the district court granted the defendants summary judgment on plaintiffs' first claim, the parties entered into a settlement

---

[7]Both parties submit that Plaintiff did not succeed on the merits, as such the sole issues before the Court are whether the Court's retention of jurisdiction to enforce the parties' Agreement and the Court's integration of the Agreement in the dismissal order constitute sufficient judicial imprimatur to allow Plaintiff prevailing party status.

agreement that resolved plaintiffs' remaining six claims. *Id*. In the agreement, the defendants denied any liability arising from plaintiff's allegations but agreed to various changes in the way future benefits claims would be handled. *Id*. A week later, the plaintiffs and defendants executed a Stipulation and Order of Discontinuance which acknowledged that the parties had entered into a settlement agreement and dismissed plaintiffs' claims with prejudice as to defendants, also stating: "This Court shall retain jurisdiction over the settlement agreement for enforcement purposes." *Id*. at 78. The Second Circuit found that though an agreement was reached before a formal order was drafted, the parties' agreement received "sufficient judicial sanction to justify considering plaintiffs [to be] prevailing parties." *Id*. at 83. The Court reasoned that, due to the fact that the district court retained jurisdiction, it was the court's order that "[c]reated the change in the legal relationship between plaintiffs and . . . defendants." *Id*.

In this case, like in *Roberson*, the parties' dismissal order contained language under which the district court retained jurisdiction to enforce the terms of the Agreement. *See* Voluntary Dismissal Order.[8] The Court, therefore, is persuaded that, without the formal Agreement, the Defendants would not have been legally obligated to provide Ms. Doe with care and treatment at the Academy, and that, by securing continuing enforcement jurisdiction, the district court was sufficiently involved to convey prevailing party status on this case. *See* Pl.'s Application at 5. Though Defendants counter that *Roberson* is distinguishable because unlike the instant case, in *Roberson*, the defendants had ongoing obligations pursuant to the settlement agreement which the court oversaw through its continuing jurisdiction, the Court disagrees. *See* Defs.' Memo Contra at 10. In ¶ 4 of the Agreement – "On-

---

[8] In the "Joint Motion for an Order of Voluntary Dismissal," the parties wrote, "Court retains jurisdiction to enforce the terms of the Agreement." *See* Order of Voluntary Dismissal at 1.

going Monitoring of Provision of Services by Defendants" – the parties agreed that "Jane Doe shall be monitored subject to the terms and conditions of the Placement Provider Agreement." *See* Agreement ¶ 4. Therefore, like the parties' agreement in *Roberson*, Plaintiff and Defendants expressly recognized that Defendants' duties with respect to Ms. Doe are ongoing. Accordingly, the Court finds Defendants' arguments as to duration of the parties' Agreement are without merit.

The issue of whether a plaintiff is entitled to prevailing party status when the parties have entered a private settlement agreement enforced by the Court's continuing jurisdiction, and formalized in the Court's dismissal order is one of first impression in the Sixth Circuit. Interpreting *Buckhannon*, and employing the precedent of the majority of the circuit courts to have considered the issue, this Court is persuaded that Plaintiff in this case is entitled to prevailing party status. As in *Roberson* and *Chmielarz*, though the parties did not enter into a formal consent decree in which the Court evaluated the fairness of the Agreement, by allowing the Court to continue its jurisdiction over the issues should future enforcement problems arise, the Court has acted to alter significantly the parties' legal relationship. As such, the Court finds that Plaintiff, Ms. Doe, is legally entitled to recover attorney's fees.

### B. Whether OLRS is Entitled to Reasonable Attorney's Fees from ODMH

Defendants argue that, regardless of whether Plaintiff may be entitled to attorney's fees under *Buckhannon*, the Court should exercise its discretion to *not* award attorney's fees. *See* Def.'s Memo Contra at 5. Essentially, Defendants contend that it would be counter-productive to take money from ODMH, a publicly funded agency required to maintain, operate, manage and govern state institutions for the care and treatment of mentally ill persons, and give it to OLRS, another publicly-funded agency

with "a similar mission and mandate." *See id*.

The Court, however, finds Defendants' argument unpersuasive. First, OLRS and ODMH have "quite dissimilar missions and mandates." *See* Pl.'s Reply at 2. In 1986 Congress established a system for the protection and advocacy of mentally ill persons, and OLRS was designated as Ohio's protection and advocacy agency under this legislation. *See id*.[9] Second, the Ohio Court of Appeals, Seventh Appellate District, has recognized that there is no state law impediment to an award of attorney's fees under federal fee shifting statutes when OLRS lawyers represent the prevailing party. *See Bd. of Ed. Austintown Sch. Dist., et al. v. Mahoning Co. Bd. Of Mental Retardation and Developmental Disabilities*, 723 N.E.2d 617 (Ohio App. 1998) (finding that OLRS was entitled to fees notwithstanding its public funding, and that fees were in the nature of "costs," not "damages"); *James H. v. Ohio Dept. of Mental Health & Mental Retardation*, 439 N.E.2d 437 (Ohio App. 1980) (R.C. 5123.60 [previously 5123.94] grants OLRS capacity to bring suits in its own name for injunctive relief but not damages).

In this case, OLRS, on Plaintiff's behalf, sought injunctive relief against ODMH to protect Plaintiff's rights under the Constitution through 42 U.S.C. § 1983, Title II of the ADA, and Section 504

---

[9]Plaintiff writes,

> As Ohio's protection and advocacy ("P&A") agency, under the PAIMI Act, 42 U.S.C. § 10803, OLRS is "independent of any agency in the State which provides treatment or services . . . to individuals with mental illness," and is authorized to "pursue. . . legal remedies" to "ensure the protection of individuals with mental illness who are receiving care and treatment in the State . . . ." 42 U.S.C. § 1805(a)(1), (2); Ohio Rev. Code § 5123.60(E) ("the legal rights service shall be completely independent of the department of mental health")).

*See* Pl.'s Reply at 2.

of the Rehabilitation Act of 1973, all of which are federal statutes explicitly providing for the award of reasonable attorneys fees to the prevailing party. Therefore, it is entirely appropriate for the Court to award attorney's fees to OLRS as counsel for the prevailing party in this case.

### C. Whether OLRS Attorneys are Entitled to Fees Calculated at the Relevant Market Rate

Finally, Defendants also suggest that, if the Court finds Plaintiff entitled to attorney's fees, it should, in its discretion, reduce the fee award from Plaintiff's requested $92,557.27[10] to $14,724. *See* Defs.' Memo Contra at 12. Defendants contend that Plaintiff's requested fees, which range from $115 per hour for the investigator to $260 per hour for an attorney, are excessive. *Id*.

Plaintiff, however, correctly counters that not only is there no legal support for Defendants' suggested "two-tiered" system that computes fees for private attorneys at fair market rates while consigning public and non-profit agency attorneys to a cost-related standard. Tellingly, the Supreme Court rejected that proposition over twenty years ago in *Blum v. Stenson*. 465 (1984). *Blum* involved a Medicaid lawsuit in which the plaintiff, and the plaintiff class, obtained an injunction against a New York state agency. *Id*. The plaintiffs were represented by the non-profit Legal Aid Society of New York . *Id*. The Court examined the Civil Rights Attorney's Fees Awards Act, which authorized fees under, *inter alia*, Section 1983, and concluded that "Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal organization." *Id*. at 895. The Court held that reasonable fees are "to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by

---

[10]In Defendants' Memo Contra, they incorrectly state that Plaintiff requests $88,203 in fees for attorneys and an investigator.

-14-

private or non-profit counsel." *Id*.; *see also, Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989) ("[W]here there are lawyers or organizations that will take a plaintiff's case without compensation, that fact does not bar the award of a reasonable fee.").

The Sixth Circuit has also held that attorneys for publicly funded state agencies are entitled to reasonable fees at fair market value. *See Eggers v. Bullitt Cty. Sch. Dist.*, 854 F.2d 892 (6th Cir. 1988). In *Eggers*, plaintiffs' counsel were attorneys for the Kentucky Protection and Advocacy Division of the Department of Public Advocacy, an independent state agency much like OLRS. *Id*. The Defendants argued that courts could not award attorney's fees to one state agency from another state agency. *Id*. The Sixth Circuit, however, rejected this argument, finding that the relevant statute, the Handicapped Children's Protection Act, authorized an award of fees to the prevailing party. *Id*. As the court explained, "it is clear that [following *Blum*], attorney's fees can be awarded to state-funded organizations." *Id*. at 900.

Accordingly, in this case, where Plaintiff's counsel, OLRS, is a state-funded agency, as a matter of law, they are nonetheless entitled to be awarded attorney's fees at the market rate. Further, the Court finds that Plaintiff's requested hourly rate and the time spent in the litigation are reasonable as demonstrated by the Declarations of Attorneys Michael Kirkman and Gary Reeve, and expert psychologist, Dr. Neal Glickman. The Court, therefore, finds that Plaintiff is entitled to an award of reasonable attorney's fees and expenses in the total amount of $92,557.27 for work completed, subject to any additional fees incurred in the prosecution of Plaintiff's Application.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Application for Reasonable Attorney Fees and Expenses of Experts, and awards Plaintiff $92,557.27 for work completed, subject to any additional fees incurred in the prosecution of Plaintiff's Application.

**IT IS SO ORDERED.**


    s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: March 28, 2006**